UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:16-CR-00127-TBR

UNITED STATES OF AMERICA                                              PLAINTIFF

v.

ERIC SCOTT KEELING                                                 DEFENDANT

**Memorandum Opinion and Order**

This matter is before the Court upon Defendant Eric Scott Keeling's motion to suppress. [DN 13.] The Court held a suppression hearing on March 29, 2017 and received post-hearing briefs from the parties. [DN 21; DN 25.] Keeling's motion is ripe for adjudication. For the following reasons, his motion to suppress is DENIED.

I

This case arises from Eric Keeling's arrests on February 15 and July 29, 2016. As a result of those arrests, Keeling stands charged with one count of possession of methamphetamine with the intent to distribute, one count of being a felon in possession of firearms in furtherance of a drug trafficking crime, and two counts of being a felon in possession of firearms and ammunition. *See* [DN 1.] Keeling moves to suppress the evidence and statements stemming from each arrest.

A

In 2014, the Greater Hardin County Narcotics Task Force began investigating the trafficking of crystal methamphetamine through Bloomfield and Chaplin, two small towns in Nelson County, Kentucky. [DN 16 at 5.] Early in its

investigation, the task force suspected that Eric Keeling was possibly manufacturing methamphetamine. [*Id.*] On February 15, 2016, the task force received information from a confidential source (CS) that Keeling would be bringing methamphetamine from Louisville to Chaplin. [*Id.* at 6-8.] Michael Watts, a narcotics detective employed by the Nelson County Sheriff's Department, testified that the CS had previously provided Watts with reliable information regarding the task force's narcotics investigation. [*Id.* at 8.] On this occasion, the CS told the task force Keeling was driving a green truck, delivering a quantity of methamphetamine from Louisville to Chris Evans' house in Chaplin. [*Id.* at 6-8, 10.] After receiving this information, the task force attempted to get back in touch with the CS to set up a controlled narcotics purchase, but they were unable to reach the CS. [*Id.* at 9.]

Instead, the task force set up surveillance on Evans' home. [*Id.* at 9-10.] Like Keeling, Evans was a person of interest in the task force's investigation. Law enforcement had received complaints that Evans was dealing methamphetamine, and Evans had recently been arrested by the Bloomfield Police Department. [*Id.* at 10.] Detective Watts characterized Evans' residence as a "drug house." [*Id.*] The task force also knew Evans and Keeling had a close relationship, and Keeling had borrowed Evans' vehicle on a prior occasion. [*Id.*]

Based upon the information they received from the CS and their suspicion that Keeling and Evans were trafficking methamphetamine, members of the task force decided to stake out Evans' house, in hopes Keeling would arrive. Several

2

law enforcement officers were involved in the operation: Detective Michael Watts, Captain McKenzie Mattingly, Bardstown Police Department Sergeant Kyler Wright, and Nelson County Sheriff's Deputies A.J. Lewis and Levi Preston. [*Id.* at 11.] Watts told his fellow task force members Keeling was a "key player" in methamphetamine trafficking, he had previously resisted arrest, and there was a possibility Keeling could be armed. [*Id.* at 11-12.] The task force was also aware Keeling was a convicted felon. [*Id.* at 12.]

That evening, Detective Watts and Captain Mattingly positioned themselves across the street from Evans' house, about fifty to one hundred yards away. [*Id.* at 29.] They were not observing Evans' residence directly, but rather were viewing live video from a pole camera put up specifically for this investigation. [*Id.* at 30-31.] The other officers were stationed west of Evans' house on Lawrenceburg Road. [*Id.* at 14.] Around 11:00 p.m., Keeling arrived at Evans' house in a green truck. [*Id.* at 15, 29.] Viewing the video stream on an iPad, Watts and Mattingly saw Keeling go inside Evans' residence. [*Id.* at 31-32.] They could not see if Keeling was carrying anything. [*Id.*] Keeling stayed inside for fifteen to twenty minutes. [*Id.* at 14-15.] Detective Watts testified that this time frame was sufficient for Keeling and Evans to "sit down and conduct business." [*Id.* at 15.]

Keeling left Evans' house and headed east on Lawrenceburg Road. [*Id.* at 15.] At this point, Watts testified that the task force had decided to attempt a traffic stop. [*Id.*] Watts radioed the other officers, but they lost sight of Keeling's vehicle before they could pull him over. [*Id.* at 16.] Believing Keeling couldn't

3

have gone far, the task force officers continued to patrol the Chaplin area. [*Id.*] Watts and Mattingly drove to a nearby house belonging to Johnny Janes. [*Id.* at 16-17.] The task force believed Janes was also involved in drug activity, as they "had several arrests [and] people with drug charges pulled out of [his] residence." [*Id.* at 17.] Further, Watts believed Keeling was dating Janes' daughter, Amanda Bivens. [*Id.*] As they passed Janes' house, located at the corner of Lawrenceburg Road and Broadway Street, Watts and Mattingly saw Keeling's truck in the driveway. [*Id.*] They took up a position further down Broadway, from which they could observe Janes' house and Keeling's truck. [*Id.* at 18.]

About twenty minutes later, Keeling and a passenger left Janes' house, got in Keeling's truck, and started driving south on Broadway toward Watts and Mattingly. [*Id.*] The two officers were in Mattingly's unmarked truck, and Mattingly was driving. [*Id.* at 19-20.] As Keeling approached, Mattingly pulled out in front of Keeling and drove slowly so the other task force officers could catch up. [*Id.* at 19.] Watts believes this action "spooked" Keeling, and he made a quick turnaround in the parking lot of a school. [*Id.* at 19.] Watching through the rearview mirror, Watts testified that Keeling did not signal his turn into the parking lot. [*Id.* at 20.] Watts said Keeling's turn was "abrupt," and that Keeling "whipped it in there pretty quick." [*Id.* at 19, 20.] Keeling, now northbound on Broadway, attempted to turn back onto Lawrenceburg Road. However, by that time the other officers had reached the location, and met Keeling's vehicle at the intersection of Broadway and Lawrenceburg Road. [*Id.* at 20.]

4

Three marked cruisers stopped Keeling at the intersection. One car was driven by Sergeant Kyler Wright. Wright testified that when he activated his emergency equipment, Keeling "immediately started to reach over towards the center floorboard of the vehicle." [*Id.* at 46.] Wright exited his cruiser, drew his weapon, and told Keeling to show his hands. [*Id.* at 49.] By this time, Deputy A.J. Lewis had arrived on the scene and blocked Keeling's vehicle in from the rear. [*Id.* at 65.] Lewis testified he also saw Keeling lower his right hand towards his waistline. [*Id.* at 66.] In response, Lewis drew his own weapon and ordered Keeling to put his hands back up. [*Id.*] Lewis then opened the truck's door, took Keeling out of the vehicle, and put him on the ground. [*Id.*] Lewis handcuffed Keeling and walked him back to Lewis's cruiser. [*Id.*] There, he conducted a pat-down search of Keeling's person and discovered a small handgun in Keeling's right coat pocket. [*Id.* at 66-67.] Deputy Preston secured Amanda Bivens, Keeling's passenger. [*Id.* at 67.]

Shortly after the officers secured Keeling and Bivens, Detective Watts and Captain Mattingly caught back up. They asked Sergeant Wright to walk his drug-sniffing dog Zeus around Keeling's truck. [*Id.* at 50.] Wright testified that Zeus, now retired from the police force, was trained to detect methamphetamine, heroin, cocaine, and marijuana. [*Id.* at 47.] According to Wright, Zeus was trained to indicate the presence of narcotics by sitting down. [*Id.* at 52-53.] Zeus first indicated on the driver's side door of Keeling's truck. [*Id.* at 52.] Based upon that indication, Wright led Zeus into the truck's interior, where he again alerted to the

5

presence of narcotics on the center floorboard area. [*Id.*] Wright returned Zeus to his cruiser and the officers searched Keeling's truck by hand, discovering two additional firearms and narcotics under the passenger seat. [*Id.* at 59-60.] Following his February 15 arrest, Keeling was charged with possession with the intent to distribute fifty grams or more of methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm and ammunition by a convicted felon.[1] *See* [DN 1.]

B

Keeling's second arrest occurred five-and-a-half months later. The facts surrounding this arrest are largely undisputed. On July 27, a man came to the Spencer County, Kentucky Sheriff's Office to report that he had been kidnapped at gunpoint by the previous day. [DN 21-1 at 2.] The details of the alleged kidnapping are largely irrelevant to Keeling's case, but in brief, the victim reported that his neighbor, Michael Grubb, came to his house and began an altercation regarding the victim's relationship with a woman. [*Id.*] Grubb led the victim back to Grubb's residence at gunpoint and held him there against his will for several hours, repeatedly threatening to kill him. [*Id.*] Based upon the victim's allegations and the statements of another witness, police obtained a no-knock search warrant for Grubb's residence. The warrant authorized police to search

---

[1] Following his February 15 arrest, the Commonwealth of Kentucky indicted Keeling on state narcotics and firearms charges. A state circuit court judge suppressed the evidence recovered during the stop, holding that the officers did not have reasonable suspicion to stop Keeling. However, the United States represents (and Keeling does not contest) that the state court misapplied the holding in *Whren v. United States*, 517 U.S. 806 (1996). [DN 21 at 6 n.6.] The United States further says that in this case, it "has presented evidence of articulable suspicion not previously provided to the State Judge." [*Id.*] Accordingly, the Court will evaluate the facts anew.

6

Grubb's house, an outbuilding, any vehicles on the property, and four specific individuals. [*Id.* at 1.] Keeling was not among those persons listed in the warrant.

A Louisville SWAT team executed the search warrant at Grubb's residence on July 29. Keeling was present and was taken into custody based upon an outstanding warrant for his arrest. [DN 21-2 at 9.] According to the police report, Keeling told the officers he had arrived at Grubb's house earlier that day in a brown Ford F-150 truck, and was waiting for someone else to arrive. [*Id.*] After clearing the house, officers searched the truck Keeling claimed belonged to him, finding a Glock 22 .40 caliber pistol in plain view. [*Id.*] This gave rise to Keeling's second felon-in-possession charge.

Keeling now moves to suppress the evidence obtained against him during both arrests. The Court held a suppression hearing, during which the United States presented the testimony of Detective Watts, Sergeant Wright, and Deputy Lewis. Following post-hearing briefing, Keeling's motion is ripe for adjudication.

II

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. If the government violates a defendant's Fourth Amendment rights, that defendant may move, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), to exclude the evidence gathered against him. *United States v. Haygood*, 549 F.3d 1049, 1053 (6th Cir. 2008). In seeking suppression, "the

burden of proof is upon the defendant" to show that the search or seizure violated "some constitutional or statutory right." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The evidence must be viewed in the light most favorable to the government. *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citing *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011)).

III

A

Keeling first argues police did not possess the necessary reasonable suspicion to stop and search his vehicle on February 15, 2016. Particularly, he claims they had an insufficient basis to conclude he was either involved in methamphetamine trafficking or failed to use his turn signal. Keeling also asserts police did not have probable cause to conduct a warrantless search of his truck. In response, the United States contends the confidential source's tip, corroborated by Keeling's subsequent conduct, established reasonable suspicion that he was involved in narcotics activity. The government also says the two positive K-9 alerts on Keeling's truck justified law enforcement's search of the vehicle.

i

To begin, a traffic stop "constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). Police may initiate a stop when they possess "reasonable suspicion of an ongoing crime or a completed felony or when [they] have probable cause to believe that a

8

civil traffic violation has been committed." *Hoover v. Walsh*, 682 F.3d 481, 493 (6th Cir. 2012). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (cleaned up). Although "reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause," *id.* (citation and internal quotation marks omitted), law enforcement officers "must point to specific and articulable facts supporting [their] suspicion," *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (citation omitted).

Here, a confidential source told Detective Watts that Keeling would be delivering methamphetamine to Chris Evans on the evening of February 15th in a green truck. Watts testified the CS had previously provided reliable information regarding narcotics trafficking in the area. That evening, Keeling arrived at Evans' house in a green truck, just as the CS predicted. He stayed there for a period of time consistent with a drug transaction and left. Granted, the task force officers were positioned such that they were unable to see whether Keeling carried anything into the house. However, Watts testified that the task force already suspected both Keeling and Evans of drug-related activity prior to the events of February 15. What's more, when officers caught back up with Keeling after briefly losing sight of him, he was parked at a house belonging to Johnny Janes, another suspected drug dealer.

9

On these facts, the Court believes the task force officers possessed reasonable suspicion to believe Keeling was engaged in narcotics trafficking and had just completed a drug transaction, thereby justifying their stop of his vehicle. A confidential informant's tip is sufficient to establish reasonable suspicion even in the absence of personal observations by an officer. *United States v. Mullins*, 47 F.3d 1171, 1995 WL 66624, at *5 (6th Cir. Feb. 16, 1995) (unpublished table decision) (citing *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993); *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990)). In *Mullins*, law enforcement received a tip from a reliable confidential informant that two persons, driving a red van, were traveling to the home of a known drug dealer to purchase cocaine. *Id.* at *6. After officers observed a red van in the vicinity of the dealer's house and conducted a traffic stop, the Sixth Circuit held their stop "was supported by a reasonable suspicion; namely, an independently corroborated tip from a confidential informant which also contained information consistent with the personal knowledge of the law enforcement officers." *Id.*; *see also United States v. Hunter*, 333 F. App'x 920, 923-24 (6th Cir. 2009) ("Tips containing specific predictive information from a known and reliable [confidential informant], which officers investigate and verify, may have the sufficient indicia of reliability to justify a *Terry* stop.").

The same is true here. The CS provided Detective Watts and the task force with details regarding a forthcoming drug transaction, the bulk of which were corroborated by the officers' personal observations. Moreover, Keeling, Evans, and

Janes were all known to the task force as potential methamphetamine manufacturers and traffickers. The officers' were entitled to conduct a traffic stop based upon that information.

The United States also argues the officers possessed probable cause to believe Keeling violated Kentucky's traffic laws. "When law enforcement officers witness a traffic violation, they may stop the driver and his car." *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Detective Watts testified that he witnessed Keeling turn into the parking lot on Broadway without signaling – a violation of KRS 189.380(2). However, while Detective Watts might have possessed probable cause to believe Keeling committed a traffic violation, there is no evidence in the record that Watts ever communicated his observation to Sergeant Wright, Deputy Lewis, and Deputy Preston – the officers who actually initiated the stop. Pursuant to the collective knowledge doctrine, "an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012) (citations omitted). But in order to act upon information received from other law enforcement, "the officer taking the action must," among other things, "act in objective reliance on the information received." *Id.* at 767 (citing *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010)). Here, Watts testified he saw Keeling turned into the parking lot without using his turn signal, but neither he nor

11

the other officers testified that Watts relayed that information over the radio. In other words, Wright, Lewis, and Preston never knew Keeling failed to signal. *See United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (collective knowledge doctrine inapplicable when one officer made unilateral decision to stop suspect's vehicle and failed to communicate basis for reasonable suspicion to arresting officer). The United States cannot rely upon Keeling's traffic violation as justification for the stop, but because the officers reasonably suspected Keeling was trafficking methamphetamine, it does not need to.[2]

ii

As relevant to Keeling's February 15 arrest, the second and final question is whether officers possessed probable cause to search Keeling's truck without a warrant.[3] Under the automobile exception to the warrant requirement, "police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)). "The test for 'probable cause' is [] whether there is a fair probability that contraband or evidence of a crime will be found in a particular

---

[2] Keeling has moved to supplement the record with testimony given by Detective Watts in Keeling's state court preliminary hearing. [DN 29.] During that hearing, Watts testified he initiated the February 15 traffic stop because of Keeling's suspected involvement in trafficking methamphetamine. Keeling argues Watts' failure to mention Keeling's failure to signal during the preliminary hearing undercuts the United States' argument that the stop was justified because of a traffic violation. The Court will grant Keeling's motion to supplement the record. However, as explained above, the Court has determined the United States cannot rely upon the alleged traffic violation because Watts did not communicate his observations to the other officers. Therefore, Keeling's supplemental exhibit does not impact the Court's analysis.

[3] Keeling does not argue Deputy Lewis acted unlawfully by removing him from the truck and conducting a *Terry* pat-down.

12

place." *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (quoting *Lumpkin*, 159 F.3d at 986).

The United States first argues the officers had probable cause based upon the two positive indications by Zeus, Sergeant Wright's drug-sniffing dog. "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). Keeling challenges Zeus's reliability, pointing out that other than Wright's testimony, the United States offered "no . . . proof about Zeus's training, certification, experience, success rate, history of false positives, [or] time in service with law enforcement." [DN 25 at 13.]

In *Diaz*, the Sixth Circuit held that the government need not necessarily introduce a dog's training records into evidence to establish its reliability. *See Diaz*, 25 F.3d at 394-95. Instead, "[a] dog's training and reliability is established for the purpose of admitting the dog's alert where 'the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog.'" *United States v. Howard*, 621 F.3d 433, 447 (6th Cir. 2010) (quoting *Diaz*, 25 F.3d at 394); *see Florida v. Harris*, 568 U.S. 237 (2013) (reliability of drug-sniffing dog determined under the totality of the circumstances).

To be sure, suppression hearings involving a dog sniff should not become "mini-trial[s] . . . on a drug dog's training and performance." *United States v. Robinson*, 390 F.3d 853, 875 (6th Cir. 2004). Still, when the Sixth Circuit has

13

affirmed a district court's determination that a dog was sufficiently trained and reliable, it has done so based upon more facts than those presented to this Court by the United States. *See, e.g.*, *United States v. Patton*, 517 F. App'x 400, 402-03 (6th Cir. 2013) ("The government introduced substantial evidence of the dog's training, certification and accuracy rate of 'over 90%.'"); *United States v. Johnson*, 267 F. App'x 412, 415-16 (6th Cir. 2008) (district court detailed the dog's history of training and performance in the field, including false-positive rate); *Robinson*, 390 F.3d at 874 (district court heard testimony from handlers that dogs were certified and reviewed their performance statistics); *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004) (handler testified dog was certified after a two-month training program); *United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1999) (handler testified that dog was certified and re-certified, trained for between 1500 and 200 hours, and had reliability rate between 90% and 97%); *United States v. Mitchell*, 81 F.3d 162, 1996 WL 145843, at *2 (6th Cir. 1996) (unpublished table decision) (handler testified that dog certified and recertified, received weekly training, and was very reliable).

Here, on the issue of Zeus's reliability, the United States introduced no evidence other than Sergeant Wright's testimony that Zeus was "trained" to detect the presence of methamphetamine, heroin, cocaine, and marijuana. [DN 16 at 47.] Although the Court found that testimony to be credible, the United States failed to provide any details regarding Zeus's training, to demonstrate he had a low rate of false-positives, or even to show he was certified by an appropriate organization.

The record regarding Zeus's certification, training, and experience is simply too bare to conclude that he was reliable on this particular occasion. And because the government failed to show Zeus was reliable, it cannot rely upon his positive indications as probable cause to search Keeling's truck.

However, the task force officers had more than just the dog sniff. As explained above, the officers had reason to believe Keeling was involved in narcotics trafficking based upon the corroborated tip from a reliable confidential source. This justified their initial stop of Keeling's vehicle. By the time they searched his truck, the officers had even more evidence – namely, the gun Deputy Lewis found in Keeling's coat. On these facts, the officers had probable cause to suspect Keeling, having just come from the houses of two suspected drug dealers, possessed evidence of drug trafficking in his vehicle. Keeling's case is similar to *Lumpkin*, where the Sixth Circuit held a corroborated tip from a reliable confidential informant and a passenger's possession of a loaded weapon, among other things, provided police with probable cause to search the defendant's vehicle. *Lumpkin*, 159 F.3d at 985-86; *see also United States v. Smith*, 510 F.3d 641, 649-50 (6th Cir. 2007); *United States v. McMurry*, 208 F.3d 216, 2000 WL 222588 (6th Cir. 2000) (unpublished table decision); *United States v. Padro*, 52 F.3d 120, 123-25 (6th Cir. 1995). Because there was a "fair probability" that contraband or evidence of drug trafficking would be found in Keeling's truck, *Cope*, 312 F.3d 775, the officers' search of the vehicle was lawful under the automobile exception, and the drugs and weapons discovered therein need not be suppressed.

B

Keeling also moves to exclude the firearm police discovered in his truck on July 29. He concedes that the warrant authorized law enforcement to search any vehicle on Michael Grubb's property. [DN 21-1 at 1.] Nevertheless, Keeling argues that because he "was not the subject of the initial investigation, was not named in the search[] warrant, and [was not] charged in connection with the initial investigation," law enforcement's search of his vehicle was outside the warrant's scope. [DN 25 at 16-17.] In response, the United States contends that the search in fact falls within the scope of the search warrant, and that law enforcement was alternatively justified in seizing the weapon because it was in plain view.

Although the parties characterize this as a scope-of-search problem, the true issue here is the particularity of the warrant. Keeling does not deny his truck was parked on Grubb's property when it was searched; thus, if the warrant, and especially the phrase "any [vehicle] on the property" is valid, the police search of Keeling's truck fell within the scope of the warrant. However, warrants authorizing the search of "all vehicles" on a particular property are "particularly vulnerable to challenge," 2 Wayne R. LaFave, *Search & Seizure* § 4.5(d) (5th ed. 2004), because the Fourth Amendment mandates that a warrant must "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV.

Nevertheless, the Sixth Circuit has held, albeit in unpublished cases, that when a warrant "specifically include[s] in its scope any vehicles present on the premises," officers may indeed search any vehicle, not just "vehicles belonging to the

16

owner of the residence to be searched." *United States v. Thompson*, 91 F.3d 145, 1996 WL 428418, at *3 (6th Cir. July 30, 1996) (unpublished table decision). *See also United States v. Ott*, 202 F.3d 270, 2000 WL 32035, at *4 (6th Cir. Jan. 6, 2000) (unpublished table decision); *United States v. Hendricks*, 888 F.2d 128, 1989 WL 125653, at *1 (6th Cir. Oct. 24, 1989) (unpublished table decision). Dictum in its published cases suggests the same. *See United States v. Smith*, 510 F.3d 641, 649 (6th Cir. 2007) ("Had the search warrant been executed a few hours earlier, the Pontiac would have easily fallen within the ambit of the warrant, which permitted the search of 1484 Albert and all vehicles on the premises."); *see also United States v. Smith*, 386 F.3d 753, 763 (6th Cir. 2004).

Here, the above-cited cases counsel that, while admittedly not a model of clarity, the search warrant issued for Grubb's property was sufficiently particular to encompass law enforcement's search of Keeling's truck on July 29. And even if the warrant did not satisfy the particularity requirement, the good-faith exception would still permit the gun seized from the truck to be admitted against Keeling. Pursuant to *United States v. Leon*, 468 U.S. 897, 922 (1984), evidence will not be suppressed when officers obtain evidence "in objectively reasonable reliance on a subsequently invalidated search warrant." Of course, the *Leon* good-faith exception does not apply: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit"; (2) "where the issuing magistrate wholly abandoned his judicial role"; (3) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence

17

entirely unreasonable;'" or (4) when a warrant is "so facially deficient—i.e., in failing to particularize the place to be search or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id*. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring)). Keeling does not argue that any of these four exceptions to *Leon* apply, nor has the Court been presented with any evidence of the same. The officers executing the search warrant for Michael Grubb's residence on July 29 reasonably relied upon that warrant in searching Keeling's truck. Their actions did not violate the Fourth Amendment, and the Glock handgun they seized will not be suppressed.[4]

## Conclusion and Order

For the foregoing reasons, IT IS HEREBY ORDERED:

Defendant Eric Scott Keeling's motion for leave to supplement the record [DN 29] is GRANTED. Keeling's motion to suppress [DN 13] is DENIED.

CC: Counsel of Record

---

[4] Because the officers' July 29 search of Keeling's truck was supported by a warrant, the Court need not pass upon the United States' plain view argument.