UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CRIMINAL ACTION NO. 3:16-CR-127-TBR

UNITED STATES OF AMERICA,                                                PLAINTIFF

v.

ERIC SCOTT KEELING,                                                    DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Motion by Defendant Eric Scott Keeling ("Defendant") to suppress certain evidence uncovered by law enforcement officers in two searches conducted in February and July 2016, respectively. [DN 39.] The United States has responded. [DN 43.] This matter is ripe for adjudication. For the following reasons, **IT IS HEREBY ORDERED** that Defendant's request for the suppression of this evidence [DN 39] is **DENIED.**

**I. Background**

The following factual background is taken from this Court's previous Memorandum Opinion and Order denying Defendant's first Motion to Suppress. [*See* DN 31.] This case arises from Defendant's arrests on February 15 and July 29, 2016. As a result of those arrests, Defendant has been charged with one count of possession of methamphetamine with the intent to distribute, one count of being a felon in possession of firearms in furtherance of a drug trafficking crime, and two counts of being a felon in possession of firearms and ammunition. [DN 1.]

In 2014, the Greater Hardin County Narcotics Task Force began investigating methamphetamine trafficking in Nelson County, Kentucky. [DN 16, at 5.] In the course of this

1

investigation, the task force began to suspect that Defendant was manufacturing methamphetamine. [*Id.*] On February 15, 2016, the task force received information from a confidential source ("CS") indicating that Defendant would be transporting methamphetamine from Louisville, Kentucky to Chaplin, Kentucky. [*Id.* at 6-8.] Michael Watts ("Watts"), a narcotics detective employed by the Nelson County Sheriff's Department, testified that the CS had previously provided Watts with reliable information regarding the task force's narcotics investigation. [*Id.*] On this occasion, the CS told the task force that Defendant was driving a green truck, and was set to deliver methamphetamine to Chris Evans' ("Evans") house in Chaplin. [*Id.* at 6-8, 10.] Thereafter, the task force was unable to reach the CS for further information. [*Id.* at 9.]

Based upon this information, the task force set up a surveillance operation at Evans' house, who was also a person of interest in the broader investigation. [*Id.* at 9-10.] Watts described Evans' house as a "drug house." [*Id.*] The task force also had knowledge of Evans' close relationship with Defendant, and Defendant had previously borrowed Evans' vehicle. [*Id.*] As a result of the information provided to law enforcement by the CS, as well as their suspicion that Evans and Defendant were trafficking in methamphetamine, several members of the task force decided to stake out Evans' home. [*Id.* at 11-12] The task force knew that Defendant was likely a "key player" in the trafficking operation, that he had previously resisted arrest, and that he could be armed. Also, the task force knew that Defendant was a convicted felon. [*Id.*]

The task force, situated roughly fifty to one hundred yards away from Evans' house, observed Defendant arrive at the residence around 11:00 p.m. in a green truck. [*Id* at 15, 29.] They were not observing Evans' home directly; instead, they were watching live video feed from a pole camera installed specifically in furtherance of this operation. [*Id.* at 30-31.] Viewing the

feed, the task force saw Defendant enter Evans' home, but they could not see if he was carrying anything. [*Id.* at 31-32.] Defendant remained in the home for around fifteen to twenty minutes, which in Watts' view was sufficient time to "sit down and conduct business." [*Id.* at 14-15.] Defendant left Evans' home, at which time the task force decided to follow him to attempt a traffic stop. [*Id.* at 15.] Thereafter, officers lost sight of Defendant's truck. [*Id.* at 16.] Believing Defendant could not have gone far, officers went to Johnny Janes' ("Janes") home, another individual suspected of being involved in drug-related activities. [*Id.* at 16-17.] Also, Watts believed that Defendant was dating Janes' daughter, Amanda Bivens ("Bivens"). [*Id.* at 17.] At Janes' home, officers observed Defendant's truck. [*Id.*] They took up a position down the street, from which they could observe Janes' house and the truck, in case it left the home. [*Id.* at 17-18.]

After about twenty minutes, Defendant and a passenger left Janes' home, got in Defendant's truck and left, travelling toward the officers' position. [*Id.* at 18.] As Defendant approached, one of the officers pulled out in front of Defendant in an unmarked car and drove slowly, so as to keep Defendant from getting away. [*Id.* at 18-20.] Watts believes this action "spooked" Defendant and he made a quick turnaround in the parking lot of a school. [*Id.* at 19.] Watching through the rearview mirror, Watts testified that Defendant did not signal his turn into the parking lot. [*Id.* at 20.] Watts said Defendant's turn was "abrupt" and that Defendant "whipped it in there pretty quick." [*Id.* at 19-20.] Officers met Defendant at a nearby intersection in three patrol cars. [*Id.* at 20, 46.] One of the officers, Kyler Wright ("Wright"), testified that when he activated his emergency equipment, Defendant "immediately started to reach over towards the center floorboard of the vehicle." [*Id.* at 46.] Wright exited his vehicle, drew his weapon and told Defendant to show his hands. [*Id.* at 49.] Another officer, A.J. Lewis ("Lewis"), was also at the scene and testified later that he observed Defendant lower his right hand toward

3

his waistline. [*Id.* at 66.] In response, Lewis drew his own weapon and ordered Defendant to put his hands back up. [*Id.*] Lewis then opened the truck's door, took Defendant out of the vehicle, and put him on the ground. [*Id.*] Lewis handcuffed Defendant and walked him back to Lewis' cruiser. [*Id.*] At that time, he conducted a pat-down search of Defendant's person and discovered a small handgun in Defendant's right coat pocket. [*Id.* at 66-67.] Another officer secured Bivens, Defendant's passenger, Bivens. [*Id.* at 67.]

By the time Defendant and Bivens were both secured, another officer had arrived with a drug-sniffing canine named Zeus. [*Id.* at 50.] Wright testified that Zeus, now retired from the police force, was trained to detect methamphetamine, heroin, cocaine, and marijuana. [*Id.* at 50.] According to Wright, Zeus was trained to indicate the presence of narcotics by sitting down. [*Id.* at 52-53.] Zeus first indicated on the driver's side door of Defendant's truck. [*Id.* at 52.] Based upon that indication, Wright led Zeus into the truck's interior, where he again alerted to the presence of narcotics on the center floorboard area. [*Id.*] Wright returned Zeus to his cruiser and the officers searched Defendant's truck by hand, discovering two additional firearms and narcotics under the passenger seat. [*Id.* at 59-60.] Following his February 15 arrest, Defendant was charged with possession with the intent to distribute fifty grams or more of methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm and ammunition by a convicted felon. [DN 1.]

Defendant's second arrest occurred almost six months later, on July 29, 2016. The facts surrounding this arrest are largely undisputed. On July 27, a man came to the Spencer County, Kentucky Sheriff's office to report that he had been kidnapped at gunpoint the previous day. [DN 21-1, at 2.] The details of the alleged kidnapping are largely irrelevant to Defendant's instant case, but in brief, the victim reported that his neighbor, Michael Grubb ("Grubb"), came to his

4

house and began an altercation regarding the victim's relationship with a woman. [*Id.*] Grubb led the victim back to Grubb's residence at gunpoint and held him there against his will for several hours, repeatedly threatening to kill him. [*Id.*] Based upon the victim's allegations and the statements of another witness, police obtained a no-knock search warrant for Grubb's residence. The warrant authorized police to search Grubb's house, an outbuilding, any vehicles on the property, and four specific individuals. [*Id.* at 1.] Defendant was not among those persons listed in the warrant. A Louisville SWAT team executed the search warrant on Grubb's residence on July 29. Defendant was present at that time and was taken into custody based upon an outstanding warrant for his arrest. [DN 21-2, at 9.] According to the police report, Defendant instructed officers that he had arrived at Grubb's house earlier that day in a brown Ford F-150 truck, and was waiting for someone else to arrive. [*Id.*] After clearing the house, officers searched the truck Defendant claimed belonged to him, finding a Glock 22 .40 caliber pistol in plain view. [*Id.*] This gave rise to Defendant's second felon-in-possession charge.

Defendant previously moved to suppress the evidence obtained in both the February and July searches. [*See* DN 13.] This Court denied that Motion. [*See* DN 31.] According to the United States, in the time since his first Motion to Suppress was denied, Defendant has obtained new counsel. [DN 43, at 1.] This newly appointed counsel has filed the instant Motion seeking, for a second time, to suppress the evidence obtained in both the February and July searches. [DN 39.]

## II. Legal Standard

### A. Fourth Amendment

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. Consistent with this, constitutional

jurisprudence provides "the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of "the exceptions to the warrant requirement is a search incident to a lawful arrest." *Id.* In order to further protect individuals' privacy interests, the Fourth Amendment demands that search warrants, when issued, are only provided upon a showing of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause justifying the issuance of such a search warrant exists where, taking the totality of the circumstances, the affidavit supporting the warrant provides the issuant Magistrate with a "substantial basis…to believe 'there is a fair probability that contraband or evidence of illegal activity will be found in a particular place.'" *United States v. McNally*, 327 F. App'x 554, 556 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 238). Moreover, in order "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). This requirement demands "a nexus between the place to be searched and the evidence sought." *Id.*

Thus, the affidavit which supports the search warrant must actually "contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (citing *Whiteley v. Warden*, 401 U.S. 560, 564 (1971)). Also, "[t]he supporting facts in an affidavit need not be based on direct knowledge and observations of the affiant, but may come from hearsay information supplied by an informant." *Id.* (citing *Jones v. United States*, 362 U.S. 257, 269-70 (1960)). The decision of a Magistrate who initially issued the warrant will be reversed by this

Court only if her "determinations were arbitrarily exercised." *United States v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012).

The Sixth Circuit has interpreted the Supreme Court's decision in *Illinois v. Gates*, and has determined that a court, in conducting a review of the sufficiency of the evidence supporting probable cause, is "limited to examining the information contained within the four corners of the affidavit" in light of the totality of the circumstances. *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). In order to deter future violations of the Fourth Amendment, the typical remedy for searches made with a defective warrant is suppression of that evidence. *See United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007). Notably though, suppression is not always warranted and, depending upon the circumstances, evidence may be saved where an officer acts objectively in good faith in her execution of an otherwise defective warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). This means that, in situations where "evidence [is] obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the "marginal or nonexistent benefits [of suppression]…cannot justify the substantial costs of exclusion." *Id.* In such a case, although probable cause is lacking, the fruits of the search need not be suppressed.

### B. Reopening a Suppression Hearing

Where a defendant's motion to suppress is "in effect a motion to reopen [a previous] suppression hearing," the trial court's decision is reviewed for abuse of discretion. *See United States v. Pittman*, 816 F.3d 419, 424 (6th Cir. 2016); *see also United States v. Baker*, 562 F. App'x 447, 450 (6th Cir. 2014) (explaining that the Sixth Circuit Court of Appeals "review[s] a district court's refusal to reopen a suppression hearing for abuse of discretion."). As the Sixth Circuit explained in *Baker*, while the trial court has discretion to reopen a previously closed suppression hearing, "it should be 'extremely reluctant' to do so." *Id.* (quoting *United States v.*

7

*Carter*, 374 F.3d 399, 405 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1111 (2005)). In reaching a determination regarding whether to reopen such proceedings, the trial court should consider the following: "the timeliness of the motion, the character of the proposed testimony, the effect of granting the motion, and, most importantly, whether the opposing party will be prejudiced by reopening the record." *Id.* (internal quotation marks and citations omitted). Crucially, a trial court only abuses its discretion by failing to reopen a suppression hearing "when the reviewing court is 'firmly convinced that a mistake has been made.'" *Id.* (quoting *United States v. Isaiah*, 434 F.3d 515, 519 (6th Cir. 2006)).

### III. Discussion

#### 1. Timeliness of the Motion

This renewed or second Motion to Suppress was filed nine months after the first one, [DN 13], and five months after this Court entered its previous Order denying it. [DN 31.] On its face, there appears to be quite an extended period of time between the denial of the first Motion to Suppress and the instant one. However, the Court is cognizant of the fact that Defendant obtained new counsel during this interim period. By the Court's estimation, Defendant retained new counsel on October 5, 2017, [DN 36], and this newly retained counsel filed the instant Motion on November 17, 2017. [DN 39.] As it pertains to the issue of "timeliness," this Court cannot say that newly appointed counsel delayed or otherwise failed to exercise diligence in writing and filing this Motion. This factor weighs in favor of Defendant.

#### 2. Character of the Proposed Testimony and Evidence

##### i. February Search

Although the timeliness factor weighs in favor of Defendant, the character of the proposed evidence Defendant would seek to have admitted in a second suppression hearing

regarding the February search weighs heavily in favor of the United States. In the instant Motion, Defendant proffers three separate pieces of evidence he believes warrant the reopening of this Court's previous Order with respect to the February search. First, Defendant argues that, at the state court suppression hearing, "Watts never acknowledge[d] the existence of a confidential source." [DN 39, at 2.] Defendant concedes, however, that Watts did indicate that "the Task Force had credible information that Defendant was bring[ing] Methamphetamine into the Chapman area of Nelson County…." [*Id.*] Second, Defendant argues that, at the state court preliminary hearing in Nelson County District Court, Watts failed to mention any confidential sources or his receipt of confidential information. [*Id.*] Third, Defendant argues that in one of the Commonwealth's Attorney's discovery responses in the state court case, the following language was included: "no confidential source was used in this case." [*Id.*] The Court will address each of these arguments in turn.

First, with respect to Watts' apparent failure to specifically testify that he had a confidential source, instead relying on the term "credible information," this all occurred at a state court suppression hearing in Nelson County, Kentucky. This Court conducted its own suppression hearing after charges were filed against Defendant in federal court. [*See* DN 16 for official transcript of the proceedings.][1] There, on March 29, 2017, Watts testified again. Throughout the course of his testimony, he discussed his confidential source with the United States:

Q: The information that you received, was it from a confidential source?

A: It was.

---

[1] In DN 16, at 2-3, previous counsel for Defendant explained to the Court that the judge in the state court case had previously suppressed the evidence, but further instructed this Court that he had informed his client that "this Court would have to make its own determination on the suppression issue." This Court acknowledged that it would do precisely that, "based on the evidence [the Court] hear[s]" at the hearing.

9

Q: And was this a confidential source that you had used in the past?

A: It was.

Q: And was that a confidential source that provided you [with] reliable information?

A: Yes.

Q: And it had provided you reliable information in relation to your investigation involving Chaplin?

A: Correct.

Q: Okay. And so beginning with in general, you had developed Mr. Keeling as a person of interest in your Chaplin investigation; is that fair to say?

A: Yes.

Q: All right. Then turning to the date of February 15th, 2016, the CS [Confidential Source] that we just talked about, had he provided you specific information about Mr. Chaplin's [sic] activities going on that day or night?

A: That's correct, yes.

Q: And just relating to that, what was the information that was provided to you regarding Mr. Keeling?

A: He advised me that he had the methamphetamine and he was in the green truck.

***

Q: Okay. Did you attempt or have any operations in motion to attempt a narcotics purchase from Mr. Keeling?

A: We attempted a purchase but couldn't reach him [the Confidential Source].

Q: Okay. Could you describe to the Court that attempted purchase? How did you set that up?

A: We had notified the CI [or CS] to see if we could purchase some methamphetamine from Mr. Keeling, and at that time we couldn't get ahold of him.

Q: Okay. And that would be coinciding with the time the CI [or CS] told you that he [Mr. Keeling] was on his way to Louisville; is that correct?

A: Correct.

***

Q: Let me stop you there. So you had information that he [Mr. Keeling] was going to a particular location. That was Chris Evans' house; is that fair to say?

A: Yes.

Q: And that was provided by the confidential informant?

A: Yes.

[DN 16, at 7-10.] As Watts' testimony makes patently clear, the police's usage of a confidential source in order to aid in the investigation into drug trafficking in the area and Defendant's alleged role in it was brought to the Court's attention. Therefore, it was also brought to Defendant's attention. Irrespective of Watts' omission of the term "confidential source" in the state court suppression hearing, this Court finds that Watts' discussion of how he became apprised of Defendant's alleged methamphetamine trafficking operation was more than sufficient at this Court's suppression hearing. As such, Defendant's first argument must fail.

Second, with respect to Watts' testimony at Defendant's state court preliminary hearing, his omission of the term "confidential source" or "credible information" does not give this Court cause to reverse its previous decision not to suppress the evidence found in Defendant's truck in February 2016. As with Defendant's first argument, this dispute originates in state court and centers on a separate proceeding. The Court is sensitive to the fact that, in Defendant's view, not

enough testimony was elicited with respect to Watts' confidential source at the state court proceeding. However, this Court did not base any of its decisions, including its decision not to suppress the evidence from the February search, on state court testimony, or any of the state court proceedings. Rather, the March 29, 2017 suppression hearing provided the Court with sufficient information regarding both the confidential source used by Watts, as well as it being credible information upon which Watts relied at the time of the February search. Watts' apparent failure to expound on how Defendant became a subject of interest while testifying in state court was of no consequence to this Court's decision, and would not have changed the result of the proceedings.

Finally, the Commonwealth's Attorney's omission in the discovery response, while troublesome, does not bear upon the present action either. Much in the same way Watts' previous testimony did not guide this Court's decision on March 29, 2017 not to suppress the evidence from the February search, neither does one discovery response during the course of the previous state court action. The United States attempts to split hairs with respect to the term "use," arguing that the Commonwealth's Attorney's discovery response was technically correct, in that the confidential source was not actually "used" because no controlled drug purchase was ever executed using the source. [DN 43, at 3-4.] Rather, detectives could not reach the confidential source and so they simply surveilled Defendant instead. [*Id.* at 4.] This argument stretches credulity as to what "using an informant" actually means, but is ultimately irrelevant to the question of whether the discovery response requires a reopening of the suppression hearing. The Court finds that it does not. This discovery response would not have changed the result, nor did it bear upon it at all.

As in *Baker*, this Court concludes that, taken together, none of Defendant's proffered pieces of evidence relating to the February search "would have changed the result of the suppression hearing" conducted by this Court. *See Baker*, 562, F. App'x at 450-51. The proceedings Defendant takes issue with were state court proceedings, and the complained-of discovery issue occurred there as well. Additionally, it should be noted that the state court actually *suppressed* the evidence. Irrespective of this, this Court conducted an independent suppression hearing, with knowledge of the state court proceedings and the result there, and decided that the evidence did not need to be suppressed. This factor weighs heavily in favor of the United States.

### ii. July Search

With respect to the July search, the Court has determined that this factor also weighs in favor of the United States. In the instant Motion, Defendant cites to a Uniform Citation for July 29, 2016, the day the search warrant was executed on Grubb's residence. [DN 39, at 4.] The Citation notes that Defendant was driving a Ford F-150. [*Id.*] "However, on the Photo Log…[from the search,] the truck where the firearm was located [is listed] as a brown Chevrolet." [*Id.*] Defendant argues that law enforcement officers misidentified the vehicle Defendant was driving that day, meaning that the gun could have been found in someone else's car. [*Id.*] Indeed, the citation issued for Defendant provides that "[t]he subject [Defendant] stated to this officer that he was driving a brown Ford F150. In the ford truck a Glock 22, 40 caliber handgun was found. The above listed is a convicted felon." [DN 39-2.] The Photo Log, though, stated that a "Glock Model 22 [was] laying on the seat" of a "brown *Chevrolet* truck…in plain view." [DN 39-3 (emphasis added).] It should be noted that different officers filled out each of these two forms.

The United States argues that this is a fact issue that could be used as a defense at trial, and so reopening the suppression hearing and/or outright suppression of the handgun is not warranted. [DN 43, at 7.] The Court agrees. What Defendant has done is raise a question of (1) whether a gun was found in a Chevrolet truck or a Ford truck, and (2) whether Defendant was driving the truck in which the gun was actually found. This type of fact question is best suited for a possible defense at trial and does not go to the legality or constitutionality of the underlying search of the premises and the truck. As such, this factor weighs in favor of the United States.

### 3. The Effect of Granting the Motion & Prejudice to the United States

New counsel was just appointed to Defendant, and the case is still a considerable time away from trial. Thus, the broader negative effect of reopening the suppression hearing would, in the Court's view, be minimal. However, the prejudice to the United States would be significant, in that it would be forced to relitigate the legality and constitutionality of these two searches, which, after careful consideration, were already determined by this Court to be lawful, both at the suppression hearing and again today. *See United States v. Stennis*, 457 F. App'x 494, 502 (6th Cir. 2012) ("The court's primary focus should center on whether the opposing party would suffer prejudice from reopening the proceeding.") (internal quotation marks and citations omitted). Under the circumstances, it would be improper to reconsider the searches, and the Court declines to do so.

### IV. Conclusion

After weighing all of the evidence and considering the parties' respective filings, the Court has determined that Defendant's Motion to suppress the evidence from the February and July searches must be denied. Moreover, the Court declines to reopen the suppression hearing with respect to either search. A balancing of the factors and an examination of the new pieces of

evidence proffered by Defendant shows that the fruits of the February search need not be suppressed: the Court conducted its own suppression hearing and did not rely on any of the state court proceedings in reaching its determination. Moreover, the question of whether the gun found actually belonged to Defendant (*i.e.*, whether the gun was found in Defendant's truck or in a different brown truck) is a question that should be presented as a defense at trial. It does not affect the legality of the search, and is therefore not a ground upon which this Court would suppress the gun or otherwise reopen the suppression hearing.

**THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendant's Motion [DN 39] is **DENIED.**

2. Because the Court has determined that the February search was lawful, the United States' Motion to Supplement the Record [DN 43] is **DISMISSED AS MOOT.**

**IT IS SO ORDERED.**

cc: Counsel of Record